IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA

| | |
|---|---|
| Jasmin Shipman, individually and as a representative of the class,<br><br>      Plaintiff,<br><br>v.<br><br>AppFolio, Inc.,<br><br>      Defendant. | CASE NO:<br>CIVIL DIVISION<br><br>**CLASS REPRESENTATION**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiff Jasmin Shipman ("Plaintiff"), on behalf of herself and the class set forth below, and states as follows:

### INTRODUCTION

1. This is a class action for damages, costs, and attorneys' fees brought against Defendant AppFolio, Inc. ("Defendant" or "AppFolio") pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"). Defendant is a consumer reporting agency that produces tenant screening reports. In Florida housing courts, it is common for the landlord and the tenant to resolve the matter via a "consent order." This order is not a judgment and is entered for the purpose of avoiding the entry of a judgment. Due to its faulty procedures, however, Defendant inaccurately reports these consent orders as "judgments," thus inaccurately making it appear as if an eviction judgment had been entered against the tenant, harming the tenant's ability to obtain housing.

2. The FCRA is designed to remedy and prevent these types of reporting errors. Recognizing the important role in our economy played by consumer reports—which either empower or impair an individual's access to housing, credit, employment, and more—Congress passed the FCRA in 1970 to regulate consumer reporting agencies' ("CRAs") collection,

1

maintenance, and disclosure of consumer report information. In doing so, Congress insisted that CRAs "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy" and "adopt reasonable procedures" that are "fair and equitable to the consumer." 15 U.S.C. § 1681.

3. In particular, and as the legislative history reveals, the FCRA "was crafted to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (internal citations omitted).

4. Defendant's procedures described herein—and the inaccurate and harmful consumer reports that they produce—violate the FCRA. Specifically, despite the public availability of court records that conclusively establish that no judgment was entered, Defendant systemically fails to ensure that accurate information about Florida eviction cases is sold and published to landlords and property managers. This results in Defendant publishing harmful and inaccurate information about consumers' eviction cases which in turn results in consumers being denied housing and other critical opportunities.

5. Defendant is aware of the importance of reporting a consumer's eviction history accurately, as a judgment can have a devastating impact on a prospective tenant's ability to secure housing. In marketing its tenant screening services, Defendant explains that it "us[es] pre-set leasing criteria to quickly and painlessly screen applicants."[1] In particular, Defendant "checks an applicant's credit score, criminal history, eviction history, and verifies their income and rental

---

[1] *Marketing and Leasing, Tenant Screening*, AppFolio, https://www.appfolio.com/our-software/marketing-leasing (last visited February 2, 2022).

history, everything [landlords, mortgage brokers, and property managers] need to make informed decisions about applicants."[2]

6. Thus, Defendant knows that landlords and property managers rely on the eviction records it reports in making leasing decisions. In fact, depending on the client's pre-set leasing criteria, Defendant might recommend that an applicant be rejected based on the eviction history information that Defendant reports.

7. Because Defendant's process is systematic and largely automated, on behalf of herself, and a class of similarly situated individuals, Plaintiff brings claims pursuant to the FCRA, 15 U.S.C. § 1681e(b).

## PARTIES

8. Plaintiff Jasmin Shipman is a resident of Jacksonville, Florida.

9. Plaintiff is a natural person.

10. Defendant AppFolio, Inc. is a Delaware corporation with its principal office in Santa Barbara, California. Defendant offers its customers—including residential properties, community associations, and commercial properties—full-service property management software. As relevant to this action, Defendant "provides tenant screening services to property managers."[3]

11. Defendant is a "consumer reporting agency," as defined in the FCRA and Defendant regularly engages in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports to third parties. Defendant's tenant screening reports are consumer reports as defined by the FCRA.

---

[2] *Id.*
[3] *AppFolio Consumer Relations*, AppFolio, https://www.appfolio.com/consumer (last visited February 2, 2022); *see also supra* note 1.

3

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to 15 U.S.C. § 1681p and FLA. STAT. § 48.193(1)(a)(6).

13. The Court has personal jurisdiction over Defendant. Defendant conducts business in this County, including issuing consumer reports on residents in this County, and delivering them to prospective mortgage brokers, landlords, and management companies in this County.

14. Venue is proper in Duval County, as Plaintiff is a resident of this County, and the report at issue was issued in this County.

15. This Court has jurisdiction over this matter because the amount in controversy exceeds $30,000.

## FACTUAL ALLEGATIONS

### A. In Florida Eviction Proceedings, Courts Routinely Urge Parties to Reach an Agreement to Avoid a Judgment and its Resulting Consequences

16. In Florida, a residential landlord can seek to terminate a tenancy and evict a tenant for a number of different reasons, including the tenant's failure to pay rent or to abide by the terms of the rental agreement.

17. If a tenant allegedly violates the rental agreement, in a manner other than by failing to pay rent, and the violation is of a nature that it can be corrected, the landlord can give the tenant a seven-day notice to cure. Fla. Stat. Ann. § 83.56(2)(b). If the tenant does not fix the violation within seven days, then the landlord can treat the rental agreement as terminated, *id.*, and file an eviction action with the county court in the county where the premises are located. Fla. Stat. Ann. § 83.59(2). The complaint must "describ[e] the dwelling unit and stat[e] the facts that authorize its recovery." *Id.*

18. Alternatively, if the tenant fails to pay rent when due, the landlord may make a

4

written demand for payment of the rent or possession of the premises within three days, after which the landlord may treat the rental agreement as terminated and file an eviction action if no cure is made. Fla. Stat. Ann. § 83.56(3).

19. After being served with the complaint and eviction summons, the tenant has five business days to submit an answer or response.[4] Thereafter, when the parties go to court, and as discussed in more detail below, the judge will generally encourage them to negotiate a resolution.[5]

20. If the tenant and landlord cannot reach a negotiated resolution, however, the case proceeds to trial, which is generally a bench trial.[6] If the judge finds for the tenant, there is no eviction and the tenant can remain in the dwelling.[7]

21. If, on the other hand, the landlord wins, a judgment is entered, allowing the landlord to recover possession of the premises. Fla. Stat. Ann. § 83.62. Such a judgment is a legal document that can be enforced by the police through a "writ of possession," to forcibly remove a tenant from their rental property.[8] After an entry of judgment in favor of the landlord, the clerk of court issues the writ of possession, which allows the sheriff to secure the property and remove the tenant's belongings if the tenant does not vacate after receiving 24 hours' notice of the writ. *Id.*

22. A prevailing landlord may also recover damages caused by the tenant's noncompliance with the rental agreement. Fla. Stat. Ann. § 83.55. Where the landlord's action

---

[4] *Renter's Rights and Evictions*, Community Legal Services of Mid-Florida, last modified Feb. 26, 2021, https://www.clsmf.org/renters-rights-evictions/ (last visited February 2, 2022).
[5] *How to Answer Your Eviction During and After COVID-19*, Legal Services of North Florida, at 8, https://www.lsnf.org/wp-content/uploads/2020/05/How-to-Answer-Your-Eviction-During-and-After-COVID-LSNF-1.pdf (last visited February 2, 2022).
[6] *Id.* at 5, 8.
[7] *Id.*
[8] *Renter's Rights and Evictions*, *supra* note 4.

for possession of a dwelling is based upon the nonpayment of rent, the court may also enter a money judgment for the amount due, with costs, against the losing tenant. Fla. Stat. Ann. § 83.625.

23. For a tenant who loses an eviction action, the consequences do not stop there. In addition to being forcibly removed from their home and, in many cases, being required to pay rent, damages, and/or costs to their landlord, a tenant against whom judgment is entered experiences devastating and enduring impacts simply from having a "judgment" in an eviction proceeding associated with them.

24. Fundamentally, an eviction-related judgment is a sign that a tenant "lost the legal battle"[9] with their landlord, which in turn is an indication that the court determined that the tenant failed to pay rent or otherwise breached the rental agreement. Thus, a judgment in an eviction proceeding is "a detrimental mark on [their] record that can have long-term effects."[10]

25. A money judgment in an eviction action is typically reported on the tenant's credit history for up to seven years. This reporting can negatively impact an individual's ability to obtain credit and even employment.

26. Even where there is no money judgment, if a landlord discovers any sort of eviction judgment—which, again, indicates that a tenant lost a legal battle with a previous landlord—on a potential tenant's record, the landlord will be less likely to rent to that individual.[11]

---

[9] Angie DiMichele, *Florida House passes bills to expunge eviction records, which can have long-term effects*, Sarasota Herald-Tribune, Apr. 16, 2021, https://www.heraldtribune.com/story/news/state/2021/04/16/florida-house-passes-bills-expunge-eviction-records-some/7187163002/ (last visited February 2, 2022).
[10] *Id.*
[11] *Id.*; *see also The Effect of a Final Judgment of Eviction in Florida*, Law Office of Brian Kowal, P.A., https://briankowallaw.com/the-effect-of-a-final-judgment-of-eviction/ (last visited February 2, 2022).

Overall, an eviction judgment "complicat[es an individual's] ability to find affordable and livable housing."[12]

27.  All told, the consequences of an eviction judgment are, as one Florida attorney puts it, "drastic."[13]

28.  In part due to the devastating consequences of a judgment in an eviction proceeding, Florida judges routinely encourage the parties to instead negotiate a resolution that avoids the entry of a judgment.[14]

29.  When the parties successfully reach a resolution, "the judge will enter an agreed order," which "is a binding legal document."[15] Unlike a judgment—which can be enforced by the police—an order simply binds the landlord and tenant to the terms to which they have agreed.

30.  For example, to avoid a judgment, "a judge may ask the landlord to agree that the case will be dismissed if [the tenant] move[s] out by a certain date."[16]

31.  Where the parties reach such an agreement, an agreed order or "stipulation" detailing the specific terms, and *not* a judgment, is entered.[17]

### B. Plaintiff and Her Landlord Reached a Resolution Specifically to Avoid Entry of a Judgment

32.  On November 14, 2017, Plaintiff's former landlord Concord Management ("Concord") filed a complaint in Duval County to evict Plaintiff from Concord's HUD-subsidized

---

[12] DiMichele, *supra* note 9.
[13] *The Effect of a Final Judgment of Eviction in Florida*, *supra* note 13.
[14] *How to Answer Your Eviction During and After COVID-19*, *supra* note 5, at 8.
[15] *Id.*
[16] *Id.*
[17] Further demonstrating that an *order* consented to by a landlord and tenant is inherently different from a *judgment* in an eviction proceeding, the Florida Legislature considered a bill during the 2021 state legislative session that would have allowed a tenant who has successfully negotiated, and complied with the terms of, an agreement (but *not*, in most circumstances, a tenant subject to a judgment) to seal the record of the eviction proceeding in its entirety. *See* H.B. 1193 (2021).

rental property. Duval County, Florida Case No. 16-2017-CC-013998

33. Concord's grounds for eviction were that Plaintiff had allegedly "fail[ed] to report an income change resulting in the income exceeding the community's income requirements." *Id.* at Doc. 1 ¶ 5.

34. On November 27, 2017, Plaintiff answered Concord's complaint, denying the allegations. Specifically, Plaintiff alleged that, although she did change jobs, her income remained the same, at $10 per hour. She also alleged that Concord failed to provide her with a seven-day notice to cure. *Id.* at 8 ¶¶ 4-5; *see also* Fla. Stat. Ann. § 83.56(2)(b).

35. Given the negative consequences of an entry of judgment, and Florida courts' preference for agreed orders in lieu of trials and judgments, Plaintiff and Concord ultimately negotiated an agreement in the action.

36. On December 15, 2017, the court entered a "consent order" (effective on December 14, 2017) which expressly provided that a judgment would *not* be entered, so long as Plaintiff vacated the premises and otherwise satisfied the terms of the consent order, which, in relevant part, states that:

> [Plaintiff] will vacate the rental premises by midnight on December 17, 2017 and will return keys/gate card by 10 AM on Monday, December 18, 2017 either in person or by dropping in the Brookwood Forest Drop Box located at the leasing office. **Should she fail to do so, [Concord] may apply to this Court for a Final Judgment of Eviction and Writ of Possession, without notice. However, if she does as ordered herein, then [Concord] will dismiss this cause with prejudice.**

*See* Exhibit A (emphasis added).

37. In other words, if Plaintiff upheld the terms of the order, Concord could not even *apply* for a judgment. Indeed—and as the readily and publicly available Duval County records conclusively show—Concord did not apply for such a judgment, no such judgment was ever entered, and the case was administratively closed, effective December 14, 2017.

8

38. The action did not result in a judgment, but—as seen in the Duval County records—instead concluded in the entry of an *order* on December 15, 2017, at which point the case was administratively closed.

| 13 D13 | -- | 12/14/2017 12/15/2017 | CONSENT ORDER | 2 | Available VOR, Ready to view |
|---|---|---|---|---|---|
| 14 D14 | -- | 12/14/2017 12/15/2017 | ADMINISTRATIVELY CLOSED | 1 | Available VOR, Ready to view |

39. Had the action culminated in a judgment rather than an order, that would have been clearly reflected in the Duval County records such as shown below.

| 11 D12 | -- | 9/13/2019 9/13/2019 | FINAL JUDGMENT FOR EVICTION BOOK 18932 PAGE 1992-1992 | 1 | Request View on request |
|---|---|---|---|---|---|

**C. Defendant Incorrectly Reported that Plaintiff's Eviction Action Resulted in a Judgment, Thereby Harming Plaintiff**

40. In January of 2021, Plaintiff submitted a rental application to lease a residential property located at 135 Noel Rd., Orange Park, FL 32073 from Brandywine Homes USA, a wholly owned subsidiary of Lafayette RE, LLC ("Brandywine").

41. In processing the rental application, a representative of Brandywine requested a consumer report about Plaintiff from Defendant.

42. On or around January 6, 2021, Defendant prepared a consumer report regarding Plaintiff and furnished the report to Brandywine for a fee.

43. The consumer report sold by Defendant contained inaccurate information relating to Plaintiff.

44. Despite the clarity of the court documents and online docket, Defendant

incorrectly reported that the Concord action had resulted in a "judgment."

45. Specifically, the report included a section for "Landlord-Tenant History." That section correctly identified the action between Plaintiff and Concord, however, incorrectly listed the "Disposition" of this action as "Consent *Judgment*" (emphasis added).

Defendant: **JASMIN SHIPMAN**
Address: **1250 BROOKWOOD FOREST JACKSONVILLE FL**
Case: **CC013998**
Court: **DUVAL CIRCUIT/COUNTY (CIVIL)**
Plaintiff: **CONCORD MANAGEMENT**

| Notice Type | Disposition | Disposition Date | Filing Date | Judgement Date | Judgement Amount |
|---|---|---|---|---|---|
| • Small Claims, Eviction | CONSENT JUDGMENT | — | 11/14/2017 | — | — |

46. Moreover, that the action did not conclude in a judgment should have been apparent to Defendant, as its own report included no information whatsoever for the "Judgement Date" or "Judgement Amount" (or even for a "Disposition Date"). Of course, there was no "Judgement Date" or "Judgement Amount" to report because there was no judgment at all.

47. In sum, Defendant's report about Plaintiff was inaccurate, as it reported that the action with Concord concluded in a judgment—which is precisely the outcome that Plaintiff, Concord, and the court sought to avoid when they very purposefully agreed to end the case instead with an agreed order.

48. In the eviction context in Florida, the differences between—and the long-term risks posed by—(1) an *order* (what was in fact entered in the Concord matter) and (2) a *judgment* (what Defendant inaccurately reported to have occurred in said action) is significant. That is why Florida judges so often encourage tenants and landlords to consent to an order, thereby avoiding the entry of a judgment.

49. As a result of Defendant's report, Plaintiff was not eligible for the housing to which she had applied.

10

### D. Defendant's Business Practices

50. Over the past 15 years, there has been increased collection and aggregation of consumer data, including landlord-tenant record data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

51. As summarized in a report by the Consumer Financial Protection Bureau,[18] a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. (CFPB Report at 4.)

52. The background check industry takes in revenues of $3 billion a year industry and is growing.[19]

53. Background checks are generally created by running automated searches through giant databases of aggregated criminal, landlord-tenant, and other public record data. Background check companies collect millions of records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

54. Defendant's reports are produced largely, if not entirely, through automated processes and procedures, and the reports go through minimal, if any, manual review. The process used by Defendant to create its reports does not vary meaningfully from consumer to consumer.

55. In 2020, the FTC brought an action against AppFolio alleging that it failed to follow reasonable procedures in reporting criminal and eviction records. *FTC v. AppFolio, Inc.*,

---

[18] CFPB, *Market Snapshot: Background Screening Reports* (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").
[19] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot*, available at http://www.ibisworld.com/industry/background-check-services.html.

11

No. 20-cv-3563 (D.D.C.).

56. Specifically, the FTC alleged that AppFolio failed to follow reasonable procedures to assure that the eviction and criminal record information contained in consumer reports it furnished accurately reflected the disposition, offense name, and offense type. AppFolio paid a $4,250,000 civil penalty to resolve the FTC's action.

57. As Plaintiff's experience demonstrates, Defendant's inaccurate reporting of nonexistent judgments in eviction proceedings poses a real risk to consumers.

58. Defendant's unreasonable procedures and resulting inaccurate reports are especially threatening in light of Florida's current housing crisis. While housing instability is a pressing issue nationwide, the situation is particularly severe in Florida, which has the third highest homeless population of any state in the country.[20]

59. Especially in the wake of COVID-19, landlords and tenants have been negotiating agreements and consenting to orders, thereby avoiding judgments and their devastating, long-term consequences for tenants.

60. Defendant's continued use of unreasonable procedures and failure to accurately report the disposition in these situations as an "order"—and not a "judgment"—does and will continue to put countless people at risk of missing out on housing opportunities.

61. As Plaintiff's experience shows, by falsely reporting judgments in eviction proceedings, Defendant puts Plaintiff and the class members at a significant risk of being unable to secure stable, affordable housing.

62. Defendant's unreasonable procedures and inaccurate reporting are especially

---

[20] *Home Matters 2021*, The Florida Housing Coalition, at 24, https://www.flhousing.org/wp-content/uploads/2021/03/Home-Matters-Report-2021.pdf (last visited February 2, 2022).

12

egregious given that Plaintiff and each class member worked with the court and their former landlords to agree to an order—not a judgment, as Defendant falsely reported—*precisely* to avoid the risks associated with an entry of a judgment in their eviction proceedings.

## CLASS REPRESENTATION ALLEGATIONS

63. Plaintiff brings her claims on behalf of herself individually, and, pursuant to Fla. Rule of Civ. P. 1.220(a) and (b)(3), on behalf of the following Class, defined as:

> All individuals who were the subjects of consumer reports furnished by Defendant in the two years predating the filing of this Complaint and continuing through the date the class list is prepared, which reported that a Florida eviction proceeding concluded in the disposition of a "judgment" where no judgment had been entered in the proceeding.

64. Plaintiff reserves the right to further modify the Class definition set forth herein.

65. The Class satisfies the requirements of Fla. Rule of Civ. P. 1.220(a) as follows:

a. <u>Numerosity:</u> The Class is so numerous that joinder of all class members is impracticable. Given the volume of Defendant's business, there are hundreds or thousands of class members.

b. <u>Commonality:</u> This case presents common questions of law and fact, including but not limited to:

   1) Whether Defendant violated the FCRA by failing to follow reasonable procedures to ensure maximum possible accuracy of the information contained in consumers' reports with respect to the disposition of eviction proceedings;

   2) Whether Defendant's violations of the FCRA were willful; and

   3) The proper measure of damages.

c. <u>Typicality:</u> Plaintiff's claims are typical of the members of the Class. It is typical for Defendant to report eviction actions that conclude with an *order*—whether a consent

13

order, an order of dismissal, etc.— as having concluded instead with a *judgment*. The violations suffered by Plaintiff are typical of those suffered by other class members, and Defendant treated Plaintiff consistently with other class members in accordance with its standard policies and practices.

d. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class because she and her experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class.

66. Class certification is appropriate under Fla. Rule of Civ. P. 1.220(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

67. In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

68. Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action.

The administration of this action can be handled by class counsel or a third party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**CLAIM FOR RELIEF**
**15 U.S.C. § 1681e(b)**
**On behalf of Plaintiff individually and on behalf of the Class**

69.     Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth at length herein.

70.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished regarding Plaintiff and members of the Class. For example, Defendant inaccurately reported that Plaintiff was subject to a judgment in an eviction proceeding, when, as the court records plainly show, the proceeding instead concluded in the entry of an order. Moreover, Defendant did not verify other data points, such as the supposed judgment date, or otherwise consult with publicly available online records.

71.     The foregoing violations were negligent and/or willful. Defendant acted in knowing or reckless disregard of its obligations and the rights of Plaintiff and other class members under 15 U.S.C. § 1681e(b).

72.     As a result of Defendant's conduct, Plaintiff and class members suffered actual damages including but not limited to lost housing opportunities, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

73.     Plaintiff and members of the Class are entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorneys' fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o and 15 U.S.C. § 1681n.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, seek the following relief:

a. Determining that this action may proceed as a class action under Fla. Rule of Civ. P. 1.220.

b. Designating Plaintiff as the representative for the Class;

c. Designating Plaintiff's Counsel as counsel for the Class;

d. Issuing proper notice to the Class at Defendant's expense;

e. Declaring that Defendant committed multiple, separate violations of the FCRA;

f. Declaring that Defendant acted negligently, willfully, and in deliberate or reckless disregard of the rights of Plaintiff and the Class under the FCRA;

g. Awarding actual and/or statutory damages as provided by the FCRA;

h. Awarding punitive damages;

i. Granting appropriate injunctive relief;

j. Awarding reasonable attorneys' fees and costs and expenses, as provided by the FCRA; and

k. Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff, on behalf of herself and the Class, demands a trial by jury on all issues triable by a jury.

Dated: March 7, 2022                                                                    Respectfully submitted,

*[signature]*

Adam C. Thoresen
JACKSONVILLE AREA LEGAL AID
126 W. Adams St.
Jacksonville, FL 32202
Tel: (904) 903-4471
Fax: (904) 224-1587
adam.thoresen@jaxlegalaid.org

John G. Albanese*
Ariana Kiener*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel: (612) 594-5999
Fax: (612) 584-4470
jalbanese@bm.net
akiener@bm.net
*pro hac vice* forthcoming

*Attorneys for Plaintiff*